# IN THE SUPREME COURT
## STATE OF NORTH DAKOTA

### 2024 ND 160

Lynn Heiser and Tanya Heiser,

Plaintiffs and Appellees

v.

Nevin Dahl and Laura Dahl,

Defendants and Appellants

and

all other persons unknown claiming
any estate or interest in, or lien
or encumbrance upon, the property
described in the complaint,

Defendants

### No. 20230323

Appeal from the District Court of McKenzie County, Northwest Judicial District, the Honorable Daniel S. El-Dweek, Judge.

REVERSED AND REMANDED.

Opinion of the Court by McEvers, Justice.

Aaron J. Weber, Watford City, ND, for plaintiffs and appellees.

Derrick L. Braaten (argued), Bismarck, ND, Brittany L. Hatting (appeared) and Will Budke (appeared), Wahpeton, ND, for defendants and appellants.

**McEvers, Justice.**

[¶1]    Nevin and Laura Dahl ("Dahls") appeal from a district court judgment quieting title to certain real property in favor of Lynn and Tanya Heiser ("Heisers"). The Dahls argue the court erred in finding the Heisers established title to the disputed lands by adverse possession and acquiescence. We reverse and remand, instructing the court to make further findings as to the extent of the Heisers' adverse possession.

I

[¶2]    The Dahls were the record owners of the disputed property located in the southeast quarter of Section 19, Township 148 North, Range 98 West of the 5th P.M. in McKenzie County. The parties acquired their respective properties through their families. The property at issue is a 0.90-acre tract of land located along the southeast quarter of Section 19, which is adjacent to the Heisers' land in Section 30, and separated from the Dahls' other land by McKenzie County Road 34. County Road 34 is a gravel road that runs through the southern portion of Section 19 and along the north side of the disputed lands and has been in the same location since at least the 1960s. In October 2020, the Heisers commenced an action to quiet title to the disputed lands.

[¶3]    Various evidence was presented at trial regarding the Heisers' claims. The Heisers' predecessors, Hilman and Bernice Berg, acquired land in Section 30 in 1960 and used it as a working ranch yard and farmyard, which was passed down through the family. In 2018, Alfred Berg conveyed the property in Section 30 to his daughter, Tanya Heiser, and her husband, Lynn Heiser, through a warranty deed.

[¶4]    In the 1970s and 1980s, a machine shed, steel grain bin, hunting cabin, and outhouse were built on or near what is now the Heisers' property. A portion of the machine shed and steel grain bin are located on the disputed lands; the cabin and outhouse are near the disputed lands; and the grassy area around the structures was used for recreation. All of these structures have been continually maintained and used. The Heisers and their predecessors have also mowed and parked equipment, vehicles, and farm machinery on portions of the disputed lands. We have included a photo from Exhibit 7 for purposes of clarity.



Surveyed Area is the Disputed Lands

Mailbox Location
1940s - 2017

Equipment Parking Area - on
Disputed Lands

County Road 34

Cabin

Steel Grain Bin - portion is
on Disputed Lands

Machine Shed - portion is
on Disputed Lands

[¶5]     The Heisers' predecessors placed a mailbox on the disputed lands in the 1970s, which remained there until 2017. The Heisers' predecessors also fenced a portion of the disputed lands and allowed their livestock to graze the creek and grassy areas until 1995. The fence is no longer in use and only portions of it still exist in a state of disrepair. The Heisers lived in a mobile home on the Section 30 property, south of the disputed lands, from 1995 to 2000. During that time, the Heisers installed a drain field for the mobile home and a sewer cleanout; the sewer cleanout is still located on the disputed lands. We have included the photo from Exhibit 8 for purposes of clarity. In 2009, the Heisers moved back to a residence a short distance from the disputed lands.



[¶6]    After a bench trial, the district court quieted title to the disputed lands in favor of the Heisers, finding they had acquired the disputed lands by adverse possession and through acquiescence. The Dahls appeal.

II

[¶7]    This Court's standard of review for a bench trial is well-established:

> In an appeal from a bench trial, the trial court's findings of fact are reviewed under the clearly erroneous standard of review and its conclusions of law are fully reviewable. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all of the evidence, this Court is convinced a mistake has been made. In a bench trial, the trial court is the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations.

*Moody v. Sundley*, 2015 ND 204, ¶ 9, 868 N.W.2d 491 (cleaned up).

3

[¶8]     The Dahls argue the district court erred by awarding the Heisers the entirety of the disputed lands through adverse possession. More specifically, the Dahls argue the court erred by failing to specifically ascertain the 20-year period of the adverse possession; in finding the disputed lands had been protected by a substantial enclosure; in finding the disputed lands have been improved; and for not finding the original entry on part of the property was permissive with no finding of the time period the claim became adverse.

[¶9]     "Whether there has been an adverse possession is a question of fact, which will not be reversed on appeal unless it is clearly erroneous." *Moody*, 2015 ND 204, ¶ 11.

> To satisfy the elements for adverse possession, the acts on which the claimant relies must be actual, visible, continuous, notorious, distinct, and hostile, and of such character to unmistakably indicate an assertion of claim of exclusive ownership by the occupant. For the continuous element, N.D.C.C. § 28-01-07 provides a presumption against the adverse possession of real property unless it appears that such premises have been held and possessed adversely to such legal title for twenty years before the commencement of such action. A party who adversely possesses with or without a written instrument must hold the land continuously for 20 years. N.D.C.C. §§ 28-01-07 and 28-01-08. For the requirements of adverse possession to be met, the true owner must be removed from possession and kept out for the statutory period by an open, visible, and exclusive possession of the claimant without license or consent of the owner.

*Roth v. Meyer*, 2024 ND 113, ¶ 19, --- N.W.3d --- (cleaned up). In addition, no action claiming possession of property may be maintained unless the plaintiff or plaintiff's predecessor "possessed of the premises in question within twenty years before the commencement of such action." N.D.C.C. § 28-01-04.

> All of the elements must be satisfied, and if any elements are not satisfied the possession will not confer title. The burden is on the person claiming property by adverse possession to prove the claim by clear and convincing evidence, and every reasonable intendment will be made in favor of the true owner.

*Moody*, at ¶ 11 (cleaned up).

[¶10] The parties agree that the Heisers' claim of adverse possession is not based upon a written instrument nor upon a judgment or decree and, therefore, N.D.C.C. §§ 28-01-10 and 28-01-11 apply. *See Moody*, 2015 ND 204, ¶ 14 ("When a claim is not based upon a written instrument, ownership may be acquired by adverse possession under N.D.C.C. § 28-01-10 if there has been an actual continued occupation of the premises exclusive of any other right for a period of twenty years.").

[¶11] Section 28-01-11, N.D.C.C., narrows the scope of adverse possession when it is not based on a written instrument:

> For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument nor upon a judgment or decree, land shall be deemed to have been possessed and occupied only in the following cases:
> 1. When it has been protected by a substantial enclosure; or
> 2. When it has been usually cultivated or improved.

[¶12] The district court found the Heisers established that they and their predecessors satisfied all of the elements of adverse possession to the entirety of the disputed lands. The court found:

> Lynn Heiser, Tanya Heiser, and Alfred Berg testified from personal knowledge how they and their predecessors used, improved, and maintained the Disputed Lands as an extension of their farm and ranch yard, and as a buffer between their property and County 34, since the 1960s.
> . . . .
> . . . [V]arious structures have been built on or near the Disputed Lands. In 1977 or 1978, a machine shed was constructed by Hilman Berg. A portion of the machine shed is located on the Disputed Lands. . . . The machine shed was and is still used to store and work on machinery, equipment, and other items necessary for the farming and ranching operation. . . . The Heisers and their predecessors have maintained it as needed since it was constructed. The Dahls did not offer any testimony to dispute the location of the machine shed or the Heisers and their predecessors use of the machine shed.
> . . . [A] steel grain bin was constructed, in part, on the Disputed Lands by the Heisers' predecessors. . . . The grain bin has been used . . . since it was constructed more than twenty (20) years ago and the area surrounding the grain bin is used when loading and unloading commodities from the grain bin. The grain bin has been maintained as needed since it was constructed. The Dahls did not dispute the location of the grain bin or the Heisers' and their predecessors' use of the grain bin.

5

Hilman Berg constructed a hunting cabin near the Disputed Lands more than thirty (30) years ago and the backyard to the cabin is located, in part, on the Disputed Lands. . . . [T]he cabin has been used continuously since it was constructed. Tanya Heiser testified that the Disputed Lands behind the cabin was used [sic] a play area for children and that Bernice Berg constructed a set of steps on the Disputed Lands so people could climb up and down the creek on the Disputed Lands for recreational activities. The Dahls did not offer any testimony to dispute the location of the cabin or the Heisers and their predecessors use of the cabin and surrounding area.

. . . [N]ear the cabin is an outhouse and electrical service and [ ] both of those improvements are immediately adjacent to or are located on the Disputed Lands. . . . The Dahls did not offer any testimony to dispute the location of the outhouse or the electrical service.

In addition to the construction and use of the Disputed Lands for structures, the Disputed Lands were used by the Heisers' predecessors for other purposes. Alfred Berg testified that a large portion of the Disputed Lands was fenced and livestock were allowed to graze the creek bottom and the grassy areas of the Disputed Lands until approximately 1995. . . . The fence is not currently utilized, but portions of it still exist on the Disputed Lands. The Dahls did not offer any testimony to dispute the location of the fence or the past usage of the fence.

Lynn and Tanya Heiser testified that from 1995 to 2000, the Heisers resided in a mobile home to the south of the Disputed Lands. . . . A portion of the drain field for the mobile home sewer is located on the Disputed Lands and a cleanout pipe was and still is located on the Disputed Lands. . . . The Heisers mowed the area next to their mobile home and on the Disputed Lands as part of their residential yard. Their children also played near and on the Disputed Lands. The Dahls did not offer any testimony to dispute the location and use of the mobile home, drain field, or sewer cleanout. Lynn Heiser testified that the sewer could be utilized again and they have not removed the sewer because of the possibility of one of their children moving to that area in the future.

Lynn Heiser, Tanya Heiser, and Alfred Berg testified that they and their predecessors parked equipment, vehicles, and farm machinery on the Disputed Lands including sprayers, augers, tractors, and pickups. . . . The Heisers are constantly moving and parking various pieces of equipment on the Disputed Lands. The Dahls did not offer any testimony refuting the use of the Disputed Lands for parking equipment.

Lynn Heiser and Alfred Berg testified that the mailbox of the Heiser Property was placed on the Disputed Lands from at least the 1970s until 2017. . . . The mailbox was moved in 2017. The Dahls did not offer any testimony refuting the location and use of the mailbox.

6

Lynn Heiser, Tanya Heiser, and Alfred Berg testified that they and their predecessors have performed year-round maintenance on the Disputed Lands since the 1960s. The Heisers and their predecessors mowed the grass up to the creek, sprayed weeds on the Disputed Lands as needed, trimmed and removed trees for aesthetics and safety, picked up trash and other garbage, and other general maintenance. . . .

Lynn and Tanya Heiser testified that the Disputed Lands are also used in other ways by the Heisers. The trees on the Disputed Lands provide a partial visual barrier between the Heiser Property and County Road 34. . . . The visual barrier provides a layer of security as it is harder to see the Heisers' farm and ranch equipment from the roadway. It also grants the Heisers a degree of privacy from people using the roadway. The Disputed Lands also help control dust and sound from the roadway. The Disputed Lands also provide a visual enhancement to the Heiser Property.

Based on the testimony from the Heisers, Alfred Berg, and the other witnesses, the Court finds that the Heisers have used the Disputed Lands as an extension of their farm and ranch yard since the 1960s.

(Footnote omitted.)

[¶13]  The record supports many of the district court's findings including: the Heisers' predecessors built a machine shed and steel grain bin partially on the disputed lands and the Heisers and their predecessors used the machine shed and steel grain bin for the statutory period; the Heisers installed a drain field and sewer pipe for their mobile home, a portion of which is on the disputed lands; and the Heisers and their predecessors parked various equipment on a portion of the disputed lands. The court's findings about the Heisers and their predecessors installing and utilizing structures as well as parking vehicles and equipment on the disputed lands support its conclusion that those areas may have been adversely possessed.

[¶14]  However, the district court's findings are not adequate to support the finding that the Heisers adversely possessed the *entirety* of the disputed lands. Applying the statutory requirements, the court did not find the disputed lands were cultivated. The court based its decision on the disputed lands being protected by a substantial enclosure or that they were improved.

[¶15]  Generally, a trial court should consider all the acts of a possessory nature collectively rather than independently because adverse possession may be shown by a combination of various acts. *Larson v. Tonneson*, 2019 ND 230, ¶ 29, 933 N.W.2d 84; *see*

*also* 3 Am. Jur. 2d *Adverse Possession* § 26 (2024). Section 28-01-07, N.D.C.C., establishes a presumption against adverse possession of real property:

> In every action for the recovery of real property or for the possession thereof, the person establishing a legal title to the premises must be presumed to have been possessed thereof within the time required by law, and the occupation of such premises by any other person must be deemed to have been under and in subordination to the legal title, unless it appears that such premises have been held and possessed adversely to such legal title for *twenty years before the commencement of such action.*

(Emphasis added.) As noted by the district court, "where successive adverse occupants hold in privity with each other under the same claim of title, the time limit for maintaining an action may be computed by the last occupants from the date the cause of action accrued against the first adverse user." *Benson v. Feland Bros. Properties*, 2018 ND 29, ¶ 19, 906 N.W.2d 98.

A

[¶16]  We first address the machine shed and steel grain bin. While the district court labeled its finding as a conclusion of law, it found: "The Heisers and their predecessors have constructed and maintained two buildings on the Subject Lands that meet the standard of 'protected by a substantial enclosure' or an 'improvement' as articulated in N.D.C.C. § 28-01-11." We agree with the court's finding that the machine shed and steel grain bin were located on a portion of the disputed lands for more than 30 years and were not used by the Dahls.

1. Machine Shed

[¶17]  When the district court addressed the testimony of Alfred Berg about the machine shed—that his father had received permission from Neil Dahl, the Dahls' predecessor, to leave the machine shed where it was even though they were aware it was over the section line—the court found: "Even if some agreement existed, which the Court does not find, Nevin Dahl has been the record title owner of the Dahl Property since 1990." There is no finding that Alfred Dahl's testimony was not credible; rather, the court relied on Nevin Dahl's warranty deed listing no encumbrances to break what the record reflects was previously permissive use. The court cited to no legal authority that the passage of property from one party to another changes the use from permissive to hostile.

8

[¶18]  Jurisdictions are mixed on this issue. Some jurisdictions treat a change in ownership as a termination of the permission. For example, some jurisdictions hold that permissive use cannot extend beyond ownership of the property. *See Batterbee v. Roderick*, 278 So. 3d 882, 885 (Fla. Dist. Ct. App. 2019) ("Generally, the party claiming adverse possession bears the burden of proving that permission terminated either because (1) the claimant has asserted a hostile right, or (2) the servient estate has changed hands through death or alienation."); *see also Herrin v. O'Hern*, 275 P.3d 1231, ¶ 16 (Wash. Ct. App. 2012) ("Because permission is personal to the grantor and cannot extend beyond that person's ownership, the relevant viewpoint for determining when permissive use terminates is that of the party granting the permission.").

[¶19]  Other jurisdictions treat the sale of the dominant parcel differently. *See Barrow v. D & B Valley Assocs., LLC*, 22 A.3d 1131, 1134-35 (R.I. 2011) (stating permissive use does not end when dominant owners convey property to another; rather, a permissive use only becomes hostile when the permission has been withdrawn or events have occurred indicating the original permission cannot be obtained); *Gangle v. Spiry*, 2018 SD 55, ¶ 18, 916 N.W.2d 119 (agreeing with the Rhode Island Supreme Court and other courts, including North Dakota, "that permissive use does not ripen into a claim of hostility by the mere transfer of the dominant estate"). This Court has stated, possession of real property which is permissive at its inception only becomes adverse when there is a disclaimer of the true owner's title or there are acts of an unequivocal nature by the possessor putting the owner on notice of the hostile nature of the possession. *Woodland v. Woodland*, 147 N.W.2d 590, 598 (N.D. 1966); *see also* 3 Am. Jur. 2d *Adverse Possession* § 44 (2024).

> The law is very rigid with respect to the fact that a use permissive in the beginning can be changed into one which is hostile and adverse only by the most unequivocal conduct on the part of the user. The rule is that the evidence of adverse possession must be positive, must be strictly construed against the person claiming a prescriptive right, and that every reasonable intendment should be made in favor of the true owner.

*Lindvig v. Lindvig*, 385 N.W.2d 466, 471 (N.D. 1986) (internal citations omitted).

[¶20]  Here, the passage of title by warranty deed did not repudiate or renounce the previous permission granted; rather, it warranted the ownership of the property in the Dahls. Using the change in title to show hostile use, without more, disregarded the presumption against adverse possession. 2 C.J.S. *Adverse Possession* § 82 (2024) (when

9

entry upon land is by permission, adverse possession does not commence until the permission is repudiated and the possessor assumed an attitude of hostility toward the real owner). The district court erred as a matter of law in deciding the transfer of the property conclusively ended the permissive use indicated by Alfred Berg's testimony. In addition, the court did not make a finding when the usage became hostile and, therefore, the 20-year requirement for adverse possession has not been adequately found. Without such a finding, it appears the court misapplied the law, and we are left with a definite and firm conviction that a mistake has been made.

## 2. Steel Grain Bin

[¶21] As for the steel grain bin, the district court did not err in finding that it was an improvement to the property or that it was an enclosure. However, a steel grain bin is not an enclosure of the entire property, and the court must further explain its rationale for quieting title to the disputed lands past the portion of the steel grain bin's encroachment.

## B

[¶22] As for the mailbox, the district court did not specifically find the mailbox was an improvement. A mailbox may be considered an improvement to real property. *Siewert v. N. States Power Co.*, 757 N.W.2d 909, 920-21 (Minn. Ct. App. 2008) ("Constructing a mailbox, digging a hole, and securing the mailbox in the ground is an 'improvement to real property' . . . ."), *aff'd*, 793 N.W.2d 272, 286-88 (Minn. 2011). Placement of a mailbox on another's property may result in a prescriptive easement. *See Gajewski v. Taylor*, 536 N.W.2d 360, 361-62 (N.D. 1995) (concluding a party's adverse use of land to place and maintain a mailbox for over 20 years without consent of the owner resulted in a prescriptive easement). Here, the court did not clearly err in considering the placement of the mailbox, which was in use during the period of limitations, and that it was continuously used for over 20 years. However, the placement and use of the mailbox are not conclusive evidence that the entirety of the disputed lands was adversely possessed.

## C

[¶23] The district court's reliance on the installation and use of the fence to show the Heisers adversely possessed the *entirety* of the disputed lands is also not adequate, particularly when the court found only portions of the fence still exist. Alfred Berg testified the fence was installed in the 1940s or 1950s but has not been used since 1995 when grazing

10

in that area ended. The court made no finding of any use of the fence for any purpose in the 20 years preceding this action. Because neither the Heisers nor their predecessors used the previously fenced in area for any purpose in the 20 years preceding this action, it is unclear how they possessed the premises in question within 20 years before commencement of the action as required by N.D.C.C. § 28-01-04. Prior to 1995 the fence may have served as a substantial enclosure, but the record does not support a finding that it served as a substantial enclosure since then. "An enclosure is not sufficient to establish title by adverse possession where it is only temporary or is not maintained for the period of limitation prescribed by statute." *Martin v. Rippel*, 152 N.W.2d 332, 338 (N.D. 1967). There is no explanation why a fence in disrepair should be considered an improvement. *See Lyman v. Childs*, 2023 WY 16, ¶ 24, 524 P.3d 744 (stating a fence kept for convenience does not affect the true boundary between land; rather, a fence of convenience creates a permissive use by the non-record owner).

[¶24] In addition, the record is unclear as to the exact location of the fence and what portions remain, but a survey indicating the approximate location of the fence line indicates there is significant wooded property north of the fence line and, therefore, does not support the district court's conclusion that the Heisers adversely possessed the land north of the fence line. Section 28-01-10, N.D.C.C., requires "actual continued occupation of premises" and extends adverse possession only to "the premises actually occupied and no other." Without evidence in the record to support the location of the Heisers' actual occupation of the disputed lands north of the fenced area, the court's finding that the fence supported the Heisers' adverse possession of the entirety of the disputed lands was clearly erroneous. We are left with a definite and firm conviction a mistake has been made in finding the fence was an enclosure or an improvement based on the court's findings.

D

[¶25] The Dahls also argue the district court's analysis relying on *Larson* is misplaced. We agree the court's reliance on *Larson*, 2019 ND 230, ¶¶ 29-30, 35, in analogizing the Heisers' use of the disputed lands is overly broad. The court concluded:

> The Heisers have similarly used a portion of the Disputed Lands for their farm and ranch yard. *The Disputed Lands were improved and maintained as needed for their farming and ranching operation. Buildings were constructed and maintained, grass was mowed, trees were trimmed,*

11

*equipment moved on and off the Disputed Lands, and all for a time frame longer than the twenty (20) year threshold to establish possession.*

> The Dahls argued that the wooded creek area of the Disputed Lands was not used in the same fashion as the farm and ranch yard and therefore the Heisers cannot establish the elements of adverse possession. However, the North Dakota Supreme Court in <u>Larson</u> also analyzed the *use of the wooded area that was used as a privacy screen from the roadway.*
>
> . . . .
>
> There is no dispute that a portion of the machine shed and grain bin, which constitute significant and obvious improvements or enclosures, are located on the Disputed Lands and are closely bordered by the creek area. The Heisers' predecessors in interest constructed a fence through a portion of the creek area and used it to graze livestock. The Heisers have performed more improvements and maintenance in the creek area than the activities discussed regarding the wooded area in <u>Larson v. Tonneson</u>. The Heisers trim trees, remove deadfall, spray weeds, and remove trash from the Disputed Lands. *Such uses by the Heisers exceed the usage found adequate to meet the standards for adverse possession* by the Supreme Court in <u>Larson v. Tonneson</u>.

(Emphasis added.)

[¶26] Again, many of the facts found by the district court are supported by the record. However, we disagree that the facts here show usage of the *entire* tract adequate to meet the standards of adverse possession. While there are some similarities, the facts and holding of *Larson* are distinguishable from the case at hand. In *Larson,* the property at issue was a lake property which was part of an irregularly sized tract located near the shore of Lake Metigoshe. 2019 ND 230, ¶ 4. The survey of the disputed property in *Larson* included a platted roadway that ran through the plaintiffs' property but was never developed. *Id.* at ¶¶ 2-4. This Court concluded the district court did not err in finding the roadway was subject to an adverse possession claim because the roadway remained a privately-owned property. *Id.* at ¶¶ 24-27. Regarding the plaintiffs' adverse possession claim to the roadway, the defendants argued "the district court erred in finding the plaintiffs' use of another's trees for privacy and dust control by leaving such property natural constitutes 'usage' of those trees for adverse possession purposes." *Id.* at ¶ 34. Although a close case, this Court concluded the plaintiffs' maintenance of the wooded area, located next to the gravel road, to preserve its natural state for privacy and safety supported adverse possession. *Id.* at ¶ 35. This Court considered the character and nature of the roadway and overall lake property

when concluding the plaintiffs' general maintenance supported adverse possession. *Id*. at ¶¶ 32-37.

[¶27] Here, unlike *Larson*, the property is rural property running along a section line. County Road 34 is a public roadway which did not follow the section line, unlike an undeveloped platted roadway privately-owned and used by the parties. The nature and character of the disputed lands shows that the creek area does not function in the same way that the treed area bordering the road in *Larson* did. In *Larson*, the district court found "the Plaintiffs and their families also spent time and effort in removing trees and brush, so that the trailer homes could be placed, and the property used for its main recreational purpose at Lake Metigoshe." *Id*. at ¶ 7. Here, the Heisers did not clear trees in order to place any of their structures located on the disputed lands. The evidence suggests that the trees have actually encroached closer to the structures on or near the section line in more recent years. While the Heisers trimmed trees, the testimony was that such trimming was primarily along the driveway in and out of their property so their equipment did not get hung up while using the driveway, not to place any improvements. The Heisers must also rely on their predecessors' activity to meet the 20-year period. Alfred Berg testified that he did not generally move or trim trees, stating: "I might have trimmed a little bit where I fixed the fence one time or so, but that was all."

[¶28] Here, although the evidence suggests the creek area was used for some recreation, it was primarily used in the past to graze cattle as the creek bed was dried up most of the year, which is unlike *Larson* where the lake property was used primarily for recreation. Because the primary purpose of the creek area differs from that of the recreation area in *Larson*, the reasoning in *Larson* should be limited to the facts of that case.

[¶29] The Heisers' maintenance of the creek area by mowing the grass, trimming trees, and picking up garbage does not support a finding of improving the disputed lands in ways that are averse to the Dahls' interest in the property. While the Heisers did not seek permission to clean or generally maintain the creek area of the disputed lands, their actions qualify as ordinary care of the land and do not support a finding of adverse possession. *See Hovet v. Dahl*, 2024 ND 129, ¶¶ 11-13, --- N.W.3d --- (concluding the district court erred in finding adverse possession as one party's mowing and spraying of the disputed property constituted ordinary care and, thus, did not support a finding of adverse possession). The parking of equipment on the disputed lands shows the Heisers were using the property they

13

were mowing, but the use of the property does not convert ordinary care into improvement of the property.

[¶30] We conclude the district court's findings are inadequate to support a claim of adverse possession to the *entirety* of the disputed lands. We also note that the district court's findings appear to be adopted nearly verbatim from proposed findings, and we do not approve as a practice the court's wholesale adoption of one party's proposed findings of fact. *See Smith Enters., Inc. v. In-Touch Phone Cards, Inc.,* 2004 ND 169, ¶ 11, 685 N.W.2d 741. In addition, many of the findings are recitations of testimony rather than actual findings. "A trial court's recitation or summary of testimony presented at trial does not satisfy the requirement that findings of fact must be stated with sufficient specificity." *Id.* at ¶ 14. On several occasions the findings indicate the fact was undisputed when the record indicates there was a dispute. Although these problems with the findings are not the primary reason for reversal, on remand the court should make its own findings of fact.

[¶31] We reverse the judgment and remand for further findings indicating where the Heisers' adverse possession of the disputed lands ends based on the evidence admitted at trial.

IV

[¶32] The Dahls argue the district court erred in finding County Road 34 the boundary line between the two properties and concluding the boundary line was established by the acquiescence of the Dahls and their predecessors-in-interest. The Heisers argue County Road 34 is the obvious, natural boundary between the Heisers' property and the Dahls' property.

> The doctrine of acquiescence is separate from adverse possession and may apply when all of the elements of adverse possession cannot be met. The doctrine of acquiescence allows a person to acquire property when occupying part of a neighbor's land due to an honest mistake about the location of the true boundary, because the adverse intent requirement of the related doctrine of adverse possession could not be met. To establish a new boundary line by the doctrine of acquiescence, it must be shown by clear and convincing evidence that both parties recognized the line as a boundary, and not a mere barrier, for at least 20 years prior to the litigation. Mutual recognition of the boundary may be inferred by a party's conduct or silence. The determination whether there has been mutual recognition of a boundary is a question of fact, which we review under the clearly erroneous standard on appeal.

14

*Moody*, 2015 ND 204, ¶ 23 (cleaned up).

[¶33] The district court found County Road 34 was an obvious boundary between the properties and concluded it was the same type of boundary discussed in *McCarvel v. Perhus*, 2020 ND 267, 952 N.W.2d 86. In *McCarvel*, a road was recognized as a boundary, not because there was agreement existing between the parties for a boundary, but because mutual recognition of the boundary was inferred based on the silence of the parties. *Id.* at ¶ 14.

[¶34] Here, the district court relied on non-party witnesses who testified it was their assumption that County Road 34 was the boundary. The court erred in relying on assumptions of non-parties, as only the mutual recognition of the parties may be used to establish that both parties recognized a boundary line. *See McCarvel*, 2020 ND 267, ¶ 11 (while a boundary line must be open to observation, acquiescence "must be shown by clear and convincing evidence that both *parties* recognize the line as a boundary, not a mere barrier . . . ." (emphasis added)). In addition, the parties did not mutually recognize County Road 34 as the boundary line between the two properties. Alfred Berg testified that he understood the property line was the section line, but he treated the disputed lands as his own. The Heisers cannot meet the 20-year statutory requirement without their predecessor joining in a mutual understanding of the location of the property line. The Dahls testified that they understood the boundary between their property and the Heisers' property was the section line, not County Road 34. *See Brown v. Brodell*, 2008 ND 183, ¶¶ 12-16, 756 N.W.2d 779 (holding the doctrine of acquiescence did not apply when the parties testified they did not recognize the fence as the boundary line between the parties' properties and understood the plot lines in the land survey constituted the boundary lines).

[¶35] We conclude the district court clearly erred in finding the parties mutually acquiesced that County Road 34 was the boundary line between the respective properties.

V

[¶36] We have reviewed the other arguments raised by the parties and determined that they are either unnecessary to our decision or without merit.

[¶37] We reverse and remand with instructions for further findings on the extent of the Heisers' adverse possession.

15

[¶38] Jon J. Jensen, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Douglas A. Bahr